My name is Lindsay Ruff and I represent plaintiff-appellant Justice 360 on behalf of Boy Schiller Flexner. The South Carolina Department of Corrections has interfered with Justice 360's First Amendment rights by placing content-based restrictions on a tool of political speech. Specifically, Apelli has invoked the AG's interpretation of the secrecy statute to selectively withhold information about the impending executions of Justice 360's clients. Strikingly, Apelli has done so in an open effort to suppress judicial oversight and critique of the capital punishment process. Apelli's interpretation and application of the secrecy statute transgresses the First Amendment for three reasons. So talk to us a little bit about standing first. Because here you have, you're not threatened with prosecution. Whatever information you have, you're free to say whatever you want to about it to whomever you want to. So it's hard to see on the surface that you're censored or self-censored in some way. Tell me why it is that you have standing here. Sure. So the relevant injury, in fact, is the burden to speech that Justice 360 has suffered due to the discriminatory treatment from Apelli's content-based restrictions on disclosure of executions. Why are you discriminated against? Because Apelli has disclosed this information to certain speakers, but not others, and for only certain purposes, for not others. But the certain speakers that they disclosed it to is you. They've disclosed it to certain Justice 360 attorneys, but not other Justice 360 attorneys. And the only attorneys they've disclosed it to are those who've been willing to relinquish their First Amendment freedoms to discuss the protocols in the court. Sign a confidentiality agreement. They chose to sign. They relinquished it to you, though, right? I mean, it's hard to say that that's, like, speaker discrimination when you're the speaker that got it. Well, first, Apelli has historically disclosed the information more broadly than just to Justice 360. And we have lots of information on the record for why states all across the country have changed that approach, right? Because they had the belief, at least, that the information was being misused. So put aside the history, right? What I'm trying to understand is, like, why you think it's speaker-driven when you are the one that's getting it. We would say it's speaker-driven in that only certain attorneys, those who are willing to relinquish First Amendment freedoms are those who have given access. And we would say more of – That's on behalf of a specific client, correct? That's correct. That's correct. So the reason that certain Justice 360 attorneys sign those confidentiality agreements is that they have duties to on behalf of their client and act in those clients' best interests. And given the time crunch with impending executions on the horizon, they felt getting access to some execution information would be better than none at all. So they were put in a position where they felt they had, acting in the best interest of their clients, they had to sign those confidentiality agreements. So they're acting in the interest of their client, but you're not here on behalf of any client. Exactly. So Justice 360 isn't challenging those specific confidentiality provisions. They're challenging this overall practice of withholding execution information absent an agreement to relinquish First Amendment rights. That's the content discrimination. That's the discriminatory treatment that is giving rise to a First Amendment burden here. Can I ask a question about the information that Justice 360 got on April 14th that we just learned about? Was that pursuant to a court order? Was there a court order that authorized that disclosure? No. That was pursuant to a confidentiality agreement that was worked out between the parties, but that Mr. Moore's execution has since been stayed. We're familiar. And the same thing with Sigmund. That one also was not pursuant to a court order. Correct. That was pursuant to an agreement between the parties. But both Sigmund and Moore's executions have been stayed, so that information is no longer operative because the certification process will have to restart. And Justice 360 doesn't know what methods of execution will be certified as available at that time, let alone what the specific protocols for those methods will be. So if that's true, if what you're saying is that that information is no longer good because the executions stopped, what information do you think you would get? So your information wouldn't be good either. So you're asking for information that you've just told us is not pertinent anymore because it hadn't been certified. Well, we're asking for if and when a new execution date is set and methods of execution are certified as available, whether that be electrocution, firing squad, lethal injection, or some combination of the three. At that point, Justice 360, we're arguing, would be entitled to get access to the protocols for those methods so that it can. But do we agree now that there are no executions that are currently set in South Carolina? That is correct. One might say, given the Supreme Court's, the South Carolina Supreme Court's order, it's unlikely that any will be set until at least one or two cases go before the Supreme Court. That we disagree with. Freddie Owens has exhausted his appeals process, and we would expect his execution date to be set at any time. Do we have any reason to think the South Carolina Supreme Court is going to view his challenges different from the prior challenges that the South Carolina Supreme Court has stayed the executions on? It's difficult to assess because in staying more in Sigmund's executions, the- We don't know is your answer. Correct, because the Supreme Court- All right, so then why is your case ripe, right? Why hadn't you just said to us, yeah, maybe if they set an execution at some future date that we don't really know might happen, then Justice 360 wants information. That seems like what you just told me. Our position is that the case is ripe because there are several Justice 360 clients who have exhausted their appeals process, and the ball is in the state's court to set their execution date. But you agree you can't get the information until, because information is not set or certified, until the execution is set, right? We agree that our right will arise once certain methods of execution are certified as available, and at that point- But until then, you agree you have no right to that information. The difficulty is that- No, no, no, answer the question first and then explain the difficulty. You agree until an execution is set, you're never going to get information, and you don't want the information because it's not certified. Agreed. The difficulty is that this is an issue capable of repetition yet evading review because of the moving pieces and the compressed timeline in which these execution dates happen. And so that gives you standing? I'm sorry? That gives you standing? Yes, that gives us standing because once an execution date is set, Justice 360's clients have eight days to elect a method of execution. So Justice 360 needs that full eight days in order to consult experts. Go back to the content discrimination. Is your argument that because in prior years either your organization or others got certain execution information that that forecloses what may happen in the future? Our argument is that the state has engaged in content discrimination in multiple ways. One is that there was this historic practice, this status quo, marked by uniformity and transparency, but Appellee changed that status quo in response to the, quote, actions of- what you have isn't really effective anymore. So how do you get to content discrimination that way? So the issue is that the state has historically disclosed this information but has now instituted this new regime where it's arguing it has full discretion to either withhold execution information or disclose execution information entirely at its discretion. And as it has done so far, only if attorneys agree to relinquish their First Amendment rights to discuss those protocols publicly and in some cases to discuss those protocols in the context of lawful litigation. But you're not here on behalf of a client facing execution. You're here on your own peculiar, separate, organizational, institutional basis, which, as I understand it, you tell me if this is not right, is that you need this information so you can engage in political speech. Correct. That's correct. So why is this case any different from the Supreme Court's decision in Halchins way back when, or LAPD versus United Reporting? Because the arguments raised by the plaintiffs in that case seem to be almost on all fours with what you raise here. So Justice 360 concedes that Apelli could have chosen to never disclose this information and to uniformly withhold this information going forward, but in that case the Halchins rule that there is no general right to access government-controlled information would apply. But that is not what's happened here. Apelli has selectively disclosed the information, when doing so would facilitate compliance with the capital punishment scheme, but has withheld information in an effort to discourage scrutiny over the capital punishment process. And, as we just discussed, formerly had a- How is that different from Halchins, though? Because in that case it was over access to the jail, and the plaintiffs specifically argued that they had to have that in order to participate in the public debate. But there was an ongoing process where the sheriff would allow a certain number of folks to tour the jail. So how is that any different from this case? So in Halchins, for example, there wasn't a situation where the state was saying, you can come tour the jail if you agree to not speak about it publicly, to not disclose what you have seen here. And only people who will sign a confidentiality agreement, agreeing not to disclose what they see inside this jail, can come in. That's not what happened in Halchins. That's what's happening here, and that's content discrimination. And in Fusero, this court correctly recognized that such content-based restrictions on government-controlled information can amount to a free speech violation. And that's also what eight justices recognized in United Reporting as well. The Fusero case, to the extent it talks about an exception, if you will, or some window that's separate from Halchins, it seemed to be based primarily on information or largely on information that the information was being disclosed to some people, Maryland residents. And not the petitioner there. Is your argument how you fit into that, the fact that other Justice 360 attorneys have received information? Is that how you say we fit within the Fusero approach? Yes, it's that historically attorneys... Forget the historically. I don't mean to cut you off. I'm talking about now because the historic is... I get that argument. I'm not saying I'm not considering that, but let's not talk about that. Let's talk about contemporaneously because that's what was going on in the Fusero situation, I think. Yes. Yes, that is our argument, that only attorneys who agree to relinquish First Amendment freedoms access this information, whereas attorneys who won't relinquish those freedoms are unable to access this information. But there wasn't any barrier in Fusero of residents who received the list as to what they could do with it or who they could give it to. There was a barrier in Fusero for residents who received the list, what they could do. Specifically, they could only use the information, I believe the language was, for purposes that relate to the electoral process. So the court considered both the speaker conditions and the content restrictions. Well, they couldn't use it to go out and solicit people to buy insurance. But if the plaintiff in Fusero had approached somebody in Maryland who had the list, there wasn't any barrier on him obtaining the list from them. Correct, but that, again, isn't the situation here due to these confidentiality restrictions that Apelli has imposed. So in that way, this case is sort of like the Overbay case, which talked about the pervasive use of nondisparagement provisions and those kinds of restrictions on speech giving rise to First Amendment harms. So the attorney-client privilege here where the disclosure is made, in your view, that's where the state of South Carolina has made a mistake that gives you an opening. The attorney-client, I apologize, I'm not sure I understand the question. Well, you have all these cases that come up where the individual defendant is the one who is requesting the information for their execution.  So why isn't the attorney-client privilege something separate and apart from any type of content issue? So this case, as you noted earlier, we're bringing on our independent behalf due to our freestanding First Amendment rights as mission-driven litigators. Those were the sorts of rights recognized in the NAACP v. Button case and the In Re Primis case. So whether or not inmates have any sort of particular Eighth Amendment or due process or other interest or ability to access this information, that's not where we're arguing today, and that's simply not the question before the court. Right. But the question to you, though, is that the state of South Carolina is making some disclosure to attorneys under attorney-client privilege. And I take it that your position is that because they do that, that allows you to evade all the other Supreme Court cases and the Fuscaro case, and that's the mistake the state of South Carolina makes as far as your concern as an organization. As far as our concern, yes, the mistake that has been made has been restricting disclosure to recipients who relinquish their First Amendment rights. Can I ask a slightly different question? Imagine instead of what we've got here, we've got a grand jury investigation, right? And so certain grand jury information is needed by a lawyer representing their client. And they're entitled to that information as a result of representing their client, but they are required, pursuant to the grand jury rule 6E, to not disclose that beyond their representation. If South Carolina adopted that rule, is that a content-based restriction or speaker-based restriction? That seems like exactly what we've got here, and that doesn't look at all. This is, I think, going to tying into Judge Agee's point. Like, that happens, and we don't consider that disclosure of grand jury material as waiving grand jury information for all people and all time, right? Instead, it's narrowly tailored to that story, right, that you get it for this purpose and this purpose only. It seems like to me the state of South Carolina has just adopted rule 6E for this information. Well, in those sort of cases, I mean, you could imagine a case where, for example, a media organization would intervene and say they need access to that sort of information. And they are denied every single time, right? They continue to ask for that information, and nobody gets it, right? And presumably that would be due to an overriding state interest in secrecy. If the state here is able to articulate some overriding state interest in secrecy. No, it's not. It's based on a – that's the rule. Okay, well, then it's also based on sort of deference to the legislature or these existing rules, whereas here the rule on point, the plain text of the rule, only says that the identities of the execution team members can't be disclosed. Right, but they've got the discretion to make that choice, right? That's what I'm saying. It's like that doesn't make it an impermissible content-based regulation or decision merely because you say we're going to give it to this narrow set of clients who need it in order to, you know, defendants who need it to preserve their rights, that that opens it up for all people at all times. And that's – I'm trying to understand how that gets you to Fisero maybe is the rub. Sure. So I think the issue there would be if the state instead said we'll only give it to this narrow subset who need this information if they agree to not disclose the information to the public. That's what they do in 6E. That's exactly what they do in 6E, right? They say we'll give you the information, but if you disclose it, you're going to go to jail. Well, and if there was a historic pattern of disclosing this information without incident. It really does come back to you that South Carolina, having disclosed this information before, cannot change that practice now given the misuse of the information that they used to provide. That's the sort of crux of where we are. Correct. Our position is they can't change that status quo now on a content and viewpoint basis, which they have openly done. The content you got before would not be the content you'd get now. The content we got before would be the content we got now, but just updated to reflect. No, it couldn't be the same. I mean, if you've already got what you needed, you wouldn't have a case. And that's why we would need a declaration on a go-forward basis, because execution protocols change for each inmate, including because the training and qualifications of the execution team change with each execution. You're a little over time, but what's your best case where the disclosure of information under the attorney-client privilege has separately created content discrimination for First Amendment purposes? I would say, I mean, the issue of that exact case, I don't know if one exists off the top of my head. I mean, this issue of restrictions on access to government-controlled information amounting to content discrimination is a fairly novel line of cases. Fusero expressly acknowledges that it's the first time a court of appeals had dealt with this issue. But there are cases dealing with similar issues. For example, in the Ham v. Dunn case, which was in Alabama and related to the disclosure of execution protocols, the court ordered disclosure, noting that it needed access to the protocols in order to make an informed assessment of the constitutionality. And when a media organization later intervened to get access to the protocols, it disclosed those protocols and then actually carried out the execution without incident. So there are other cases of this information being made public, of states nonetheless being able to carry out executions, and of courts recognizing that disclosure of this information is not... But you don't have a case in the attorney-client disclosure context that relates to First Amendment content discrimination? In the attorney-client disclosure context, I don't have a case off the top of my head. I would be happy to follow up with supplemental briefing if that's the specific question you're interested in. You've got some time left on rebuttal, so we'll now hear from Mr. Hall. Thank you, Judge Enge. Gentlemen, may it please the court? And if you wish to remove your mask, you can. Thank you. I appreciate that. I'm Kevin Hall. I represent the South Carolina Department of Corrections, and it's Director Brian Sterling. Let me begin by hitting the standing issues that you raised. I don't want to spend a lot of time there because I think those issues are well-framed. The court has posed questions to the parties, which we have answered. We do not believe this issue is right. We do not believe there is standing. Similarly, you know at the district court level, we argued for the district court to abstain, slightly different grounds, but the same notion that the issue wasn't right, it wasn't appropriate for the federal court to engage at that point. So we do believe that there is, that this case should be dismissed for lack of standing. We don't believe the issues are right based on the certification distinction that Your Honor just discussed with counsel. What about opposing counsel's argument that it's capable of repetition but of age review because the timeline in these things is so short? Well, look, I understand the argument. I can say that there have been no fewer than, I think, by my count, about nine cases filed, all of which have been dealt with in those timelines. I understand that there is a short timeline, but there is no circumstance in which he was executed. So that's nine cases filed by the actual defendant? That's right. That's right. Nine cases. I've got a chart here, a color-coded chart that shows it all going on so that I can keep track of it. But there's, that's a theoretical articulation. I understand the point made, but there's just no history. And I think we all know as a practical matter, there's no way anyone's going to be executed on the basis of a timeline like that. So, again, from a standing perspective, we do not believe they're standing. If I could shift. Before you shift, can I ask a question? I'm just trying to figure out a little bit what happened. So the April 14th disclosure that was made to Justice 360 or some subset of Justice 360 on behalf of their client, that was not done pursuant to a court order, right? That is my understanding. I will caveat what I said. I'm not counsel in those cases, all right? So that is my understanding. Let's hypothesize. But they are, and she represented it wasn't, so I'll go with that. But assume for a minute that it was not done pursuant to a court order. Doesn't that tell us that that was the director then exercising his discretion to disclose the information, some information but not all, that he believes is not part of the Secrecy Act, right? Because the Secrecy Act says you can only disclose information that would reveal the identity of a GAR, of an executioner, with a court order, right? And so, but not all information, like, falls in that bucket, and I'm not trying to make a judgment of what does or doesn't. But by disclosing it to Justice 360 with a confidentiality agreement, isn't that the judgment, or shouldn't I read from that, the judgment that the director determined in the exercise of his discretion to make that disclosure, and thus his belief that that information is not protected by the Secrecy Act itself? I want to be careful here, Judge. If I'm asking, I want you to be careful. I think the Department of Corrections certainly reserves all rights with regard to what its latitude is and whether a court order is required. So I don't want to describe or characterize. So you're not, you do not accept, so I should have asked this question first. I'm glad you're being careful. Does the director have the discretion to disclose information covered by the Secrecy Act without a court order? I would want to study that more carefully before delving into it. I understand on the face of the statute what drives Your Honor's question. I mean, it looks that way, right? And if that was true, then the director's disclosure would be at least his belief. Now, his belief is not, you know, binding on this court, of course, but it would be his belief that the information that was disclosed is not covered by the terms of the Secrecy Act. Well, again, I don't want to put words in my client's mouth there, so I'm going to – I understand. I'm not asking you to. I'm going to dodge that. I'm going to say that assume for a second that a court order is required for certain information and assume hypothetically for the purpose of argument, the hypothetical that you've proposed, the First Amendment issues don't change. All of the issues in this case don't change. The analysis that we would go through in terms of Fasaro, in terms of Halchins, in terms of United Reporting and so forth don't change. So that's true, but it might change the standing analysis. That's why I'm asking it. I'm not asking it for the merits. I'm asking it for the standing. Well, again, from a standing perspective, that information would be stale at this point anyway. Now, look, clearly there's going to be an opportunity in this case for a do-over. That's the nature of these. So it may make a difference in rightness. It may affect the injury, but it doesn't affect rightness? Well, I think in terms of rightness, regardless of how this issue works out, Judge Richardson, rightness doesn't exist here. We're talking about stale information in Judge Agee's terminology, stale information at this point. So I don't think that issue engages. What they've said is, what she said, as I understand it, your counsel suggested, was that they don't want the old information. They want the prospective ability to get the information assuming and when an execution is set. They want the information immediately upon the setting of the execution. They don't want the old information. I mean, at least I understood her to be saying that. And in each of the cases involving individual defendants, they'll certainly make that ask. Yeah, but her point is different, right? I mean, we're separating Justice 360 into, like, lawyers representing clients and lawyers representing a cause. The extent we can do that, we'll just assume it for this point. But why do you say there's not a rightness concern? Because what they're asking for is information that does not yet exist, and depending on what the South Carolina Supreme Court does, may never exist, right? I mean, depending on what they say about the firing squad, there may never be information about how that is to be carried out that is certified because it may not be a method of execution in the state of South Carolina, right? So why isn't that a rightness concern that we're just saying, what are we doing talking about information that doesn't exist and, frankly, may never exist? And if it is going to exist, we don't know when it's going to exist. Again, I think the point is there is a moment in time in which the available methods of execution are identified, certified, and at that point in time, the issues can and are joined. Prior to that, and in this context, you don't have rightness. We have, as Your Honor points out, the very open question with regard to what the state court's going to do in the firing squad context. That's an open question. So to ask for that information now, prospectively, I do think presents the rightness in the standing issue that we discussed and that Judge Agee began with. So when you're looking at standing and parts of the merits, they seem to kind of blend together, and it's hard to separate them out when you're looking at it. So if I can move to a slightly different phase of analysis from what Judge Richardson has been discussing. As I understand opposing counsel's argument, it is that assuming there's standing in the First Amendment context, once the state makes a disclosure, even under attorney-client privilege directly to the defendant, that the cat's out of the bag at that point in terms of content discrimination. That they had the option to give nothing, but once they've given something, regardless of the reason for it, then they've made an error for First Amendment purposes. Well, they would have only made an error if they did it in a discriminatory fashion, right? And, of course, they argued that they did. Now, look, as you heard conceded today and acknowledged throughout, the state could henceforth say, we're never giving you anything. We tried to be nice guys. We're never giving you anything because we're not going to go through this again. That would be a viable position for the state to take. Whether the state will take that or not, I don't know. But analytically following Your Honor's question, the challenge that Justice 360 has here is that we see the 11th, the 8th, and the 5th deal with this fact pattern. Now, in those, you've got inmates asking for the information, right? But there's no question that there's no right of access. Nobody here really disputes that. What they say is, oh, wait a second. When you agreed or offered that you'd give us some information in the context of confidentiality order, you took on a new set of burdens, and they rushed to the Fasaro case for that portion. They don't go to the first part of Fasaro that reembraces Hal Chun's United Reporting. They go to the second part. And they say, all right, you know, there's a three-pronged discussion. I won't even call it an analysis in Fasaro, but there's a three-pronged discussion. Is the information closely tied to political speech that's at issue? So it's on the edge of the envelope there. Well, I would say it's way far away. Tell us why Fasaro, why they don't get the benefit of Fasaro. They don't get the benefit of Fasaro because the part of Fasaro that is applicable is the first portion which reembraces Hal Chun's. But even if you go to the second portion, they don't win, and let me explain why. The first point the court considered is whether the information was closely tied to political speech. Remember, Maryland said you've got to be a Maryland registered voter, which meant you had to be a resident, and you also have to use it only for electoral purposes. And the court has a long discussion about what is electoral purposes. Is that political? There's nothing political here in the sense of elections or electioneering. Remember, Hal Chun's and United Reporting deal much more similarly with this circumstance. They deal with the criminal justice system. They deal with arrestee records. They deal with jail access. They're not political in the sense of that term in an electoral context. They're very far removed from what the court described. So you would say Fasaro pertains to the election of a particular candidate or an office as opposed to, I mean, certainly, you know, capital punishment is a political issue. So you would say, Fasaro, that's not what Fasaro is. That would swallow up Hal Chun's. What you're saying is it's got to pertain to a particular race or a particular election? Or at least elections in general, okay? And I'll note, this is at Fasaro. The court says there are, you know, important considerations, and it goes through the three-part analysis that I described. The court describes Hal Chun's involved access to jails. United Reporting involved records of arrestees' addresses. By contrast, I'm quoting, the list is a valuable tool for political speech. It distinguishes and says this isn't those cases because this involves an election. This involves electioneering. So they're talking about politics, not in the broad sense of politics. And if you think about it, that idea would swallow Hal Chun's, would swallow everything. Everything's political, right? You could say I want environmental information. I want to know where nuclear arms are stored because of environmental concerns. You could say anything is political. But just because it's your issue of passion or choice or vocation doesn't make it political in the context of Fasaro. Fasaro clearly distinguishes there. Your view is, as I understand what you've been saying, is that Fuscaro stands only for its factual predicates in that it is limited to elections and voting as opposed to other aspects of possible political speech. I believe that's right, Judge. You know, to point this out, it's interesting. The court notes that and counsels under this. We have this completely clear Hal Chun's United Reporting, no access under the First Amendment. The court, for the first time, acknowledges it. It's the first time an appellate court has looked at this and says, well, yes, but we're kind of concerned about something here. And they distinguish Hal Chun's and they distinguish United Reporting. Those weren't political. So this case is different, Fuscaro was, because it deals with politics, electoral process. So I think this is a very important distinction. The court waded into a place no court had ever gone. In the context we're dealing with today, we're dealing with the criminal justice system. We're dealing with the same type of thing, access to information, the government's control in the context of a criminal justice system. If I can, let me jump to the second one. They say their content, the court's, in Fuscaro, the second part says, are their content and speaker-based conditions. In Fuscaro, the content-based restriction was the electoral process. The speaker-based was you had to be a Maryland registered voter and not a Virginian. There's none of that here. You can look at the brief from Justice 360, and they'll tell you all about how onerous the confidentiality order is, that they can't consult with experts, et cetera, et cetera, which is not accurate, by the way. But they don't address the questions of content and speaker-based conditions. The statute applies to everybody. No pro-death penalty person's asked for this. A pro-death penalty person that asked for the same information would have the same response. Here's the statute. So this notion that it's been selectively given to some and not to others based on viewpoint or content or the position of the speaker on an issue simply doesn't exist. Now, they style themselves as oppressed here and say, well, hey, we're for the death penalty, and that's unpopular. And because you would have any condition, the condition can only be motivated by your desire to make it hard on me. There's no basis for that. There's no basis for that whatsoever in the record. Anybody, including a pro-death penalty advocate, would have the same issue. Importantly here, the statute has no content dimension to it, no speaker identification at all, and neither do the interactions of SCDC with Justice 360. Throughout the briefs, there's this idea, well, hey, you're discriminating against because we can't challenge on an Eighth Amendment basis that which you give us pursuant to a confidentiality order. And you can't, they say, talk to experts. That is why I take the argument to be slightly different, which is what you're discriminating against is death row inmates versus non-death row inmates, right? And so either you're a death row inmate, that is you're a Marylander, right? Or you're a non-death row inmate, that being pro-death penalty, anti-death penalty, Justice 360, whoever it is, right? That means you're a Virginian, right? Why is it that the distinction that they're drawing is that the only people we're giving this to are death row inmates and that that's the improper Marylanders, if you will? Two points. First, they never make that argument, okay? So Your Honor has posited that hypothetically, but that's not made in any of the briefs. They don't say. Ah, that's close. All right. Go to the next point. They don't say there's a speaker-based distinction here. The second point is the statute deals, obviously, in the death penalty context. In order for that argument to hold up, anything that spoke specifically to the death penalty would have to alone be out of bounds. It's not out of bounds. They're simply saying in this context we have certain concerns. They act as if those aren't articulated. The Coley-Rushton Affidavit at Joint Appendix 476 and going forward sets forth the state's concerns. Timing, movements in the process of execution. If you were going to disrupt an execution, if you were going to attempt to cut the power to a jail, if you were going to run a car into a transformer and knock it down, if you were to have a sympathetic guard internally who wanted to obstruct the process, these details of timing and movement are important. The state's basis and reasons for wanting to protect that information, to protect employees, to protect inmates, to protect the process are obvious. All right. So, again, this idea that these are just made up or somehow these are, in the language of Fasaro, are these suspect conditions. There's nothing suspect about them at all. They serve a legitimate, penological process. The objective there is to say, hey, we've got to protect and safeguard the people involved and prevent disruption. Now, let me say again, I want to go back to this confidentiality order, because throughout the briefing there's a suggestion that you're gagging us. We can't go get an expert to help us figure out whether that protocol would violate the Eighth Amendment. But it's a confidentiality agreement. There's no confidentiality order. Well, there's two circumstances in which this has come up, as I understand it. In the Sigmund case, and this is Civil Action Number 321CB00278, this is a federal court case in which Judge Harwell presided. There's a consent confidentiality order that was entered. Now, throughout the briefs there's this portrayal of you gag us, you won't let us do anything, and we can't effectively represent our clients. The court, this is not in the record, but the court can take judicial notice of it. You can go to Pace and get it. It's docket entry number 36 on May, excuse me, April 30, 2021. Is Justice 360 counsel in that case? They are. Okay. They describe, they're not counsel. Actually, let me check. I thought the discussion earlier was that Sigmund was represented by 360. I think that's right. That's my understanding. They certainly argue that Sigmund, that the confidentiality requirements in the context of Sigmund are a basis of their injury. But, again, here's the point I want to leave the court with, because it's not in the record. It's something you can judicially notice. Paragraph five has a protection of confidential information, general protections. It says you can use it for purposes whatsoever, no purposes whatsoever other than preparing for and conducting the litigation in which they're disclosed and, quote, for assessing and bringing any Eighth Amendment and related challenges to defendant's method of execution. So this suggestion throughout the briefs that in the Sigmund context, they were forced to give away their ability to bring an Eighth Amendment challenge. It's just not true. The confidentiality order doesn't say that. Similarly, they say throughout, you wouldn't let us have experts.  Page three of the same confidentiality order says that the information can be provided to, quote, consultants, investigators, or experts, here and after referred to collectively as experts, employed by the parties or counsel for the parties to assist in the preparation and trial of the lawsuit and or in advising Brad Keith Sigmund on his election of execution methods and in assessing and bringing any Eighth Amendment challenge. So, again, I want to knock that down. That supposed wrong isn't there. I understand it, though, Mr. Hall. Their argument is, it sort of blends back and forth, so it's hard to determine, at least for me at some points. But I think the argument that they make is broader than that. It's not just the capacity to represent the clients, which they will have under an order like that, but it's broader political speech. We want this information in order to make a public record for influencing elections or public opinion or something of that nature. They make that broad, generalized argument. You asked for a case. What's your best case that gives you that? And the answer was, there's not one. And the only case that gives them anything to work with is Fusaro, which was the first time a court anywhere had gone down this path. The first part of Fusaro says, Houchins, Houchins, Houchins. The second part, they said, we want that second part. We want that second part. That second part is a loser for them, is this political speech. The court in Fusaro says, there's a difference between what happens in the criminal justice context and the electoral process of Fusaro. Are there content and speaker-based conditions? No. There aren't any. If you look at the briefs, you won't see any identified. And then finally, are there suspect conditions on access to the information? That's the third part of that second half of Fusaro. There's nothing suspect about wanting to preserve the safety of it. In the Fusaro case, the court ultimately said, look, there's no strict scrutiny here because the state's position is legitimate. And they said, we're going to go to, you know, a balancing test under Anderson Burdick, and we're going to send that back in this situation to the trial court because they said in that context, even though the appellate court, this court, could have ruled on the record, they said, the state hadn't set forth the bases to justify why it's doing what it's doing. See if you can kind of bring this. I gave opposing counsel some extra time, and you're over, too. I apologize. But see if you can sum up in the next minute whatever else you want to say. Number one, there's no standing here. Number two, Halchen's not a reporting government. Number three, if the second half of Fusaro is relevant to the analysis, they lose, because this is not political speech as Fusaro understood it. There are no content and speaker-based limitations as there were in Fusaro, and there are no suspect conditions imposed as the basis for withholding the information or having conditions on the information. Again, the Coley-Rush affidavit from the Department of Corrections sets forth why the state cares and wants to maintain the secrecy of that information for safety. So, again, they've got to go all through those cases, get into Fusaro, and win on that second half of Fusaro, and they can't do it. All right. Thank you very much, Mr. Hall. Ms. Ruff, you've got some rebuttal time. Thank you. Thank you. So I want to address a couple points made by counsel. The first is that the confidentiality agreement that he just read, we agree that the most recent agreements in Moore and Sigmund did give Justice 360 the ability to advise their clients and bring Eighth Amendment challenges. Can I ask again? So that's what he read from, I take it, to be a consent order? Yes, in Sigmund. And in Moore, was it a consent order or was it an agreement? It was an agreement. But that was not the initial confidentiality agreement that Apelli proposed in the Moore case. The initial agreement stated that Justice 360 couldn't use the information for any purpose, other than facilitating its client making an election between the certified methods of execution. Justice 360 couldn't use that information to consult experts or communicate with the court. That isn't what you ended up with? That's not what we ended up with. So how is that relevant? Part of the difficulty here is Justice 360 has no idea what position the state will take moving forward. In the beginning of the argument, counsel took the position that moving forward, it would be a viable position to argue we'll never give you this information again. So Apelli sort of moved the ball in these various different litigations and had different rules for different inmates. Isn't that why it's not right? Doesn't that go back to this basic idea of what are we deciding here? Because we don't know if there's going to be an execution set, if it's ever set. We don't know how it's going to be set or what methods are going to be available or what positions the state is going to take. And so it just seems an awful lot like you're asking us to decide if these seven contingencies happen, then we're going to want X. Well, the primary relief that we're seeking is declaratory relief stating that Justice 360 If these seven things happen, then you get what you want. But that's what doesn't sound like right, right? Well, that if an execution date is set, then Justice 360 is entitled to information about the methods of execution that will be used. I mean, again, we expect the Owens date to be set any day now. Not because you need it to represent the client, but because you need it to make some other political speech you wish to make. For multiple purposes. To be able to consult experts, counsel the client, communicate with the courts, and communicate with the public. And those litigation, public education. But you're getting all that except to communicate with the public under these orders and agreements, aren't you? We did get those specifically with regard to Sigmund and more, but again, those orders are no longer relevant given that those execution dates have been stayed. And we don't know what position it probably will take moving forward given that it's taken contrary positions with all the different inmates depending what the lawyers are willing to agree to. The other points that I wanted to respond to. So first, counsel made the representation that somehow the death penalty isn't political and that in Fusero was different because that involved an election. But in Fusero, the plaintiff wanted access to the voter registration list to circulate a message urging the prosecutor to resign, which as the court observed was an appointed position, not an elected position. So that case didn't involve any kind of election. And in the NAACP. The voter list did, right? Wasn't the point of Fusero that it was a voter list? And voters have something to do with elections? They recognize that a voter list is in a, quote, political context, but that specific case didn't involve an election. There was no sort of requirement that an election be at issue. And in the NAACP. But what Fusero is saying is that it's the voter list that is political, not the speech that was going to result. The voter list was found to be political because it was in a political context. And our position is that in the NAACP and Primus cases, the Supreme Court recognized that mission-driven litigation, education, and lobbying activities aimed at protecting civil liberties from government intrusion are also political speech. So this is also a political context. In that sense, is there anything that's not political speech? I mean, right? So if a person's doing it, you can be for or against. I mean, if that's your definition of political, then doesn't it swallow the rule? No, because, for example, in the Primus cases versus the, I believe it's pronounced Oralic case, the Supreme Court distinguished between attorneys who use mission-driven litigation to represent unpopular causes and defendants and who engage in litigation on behalf of their declared purpose from attorneys who engage in litigation primarily as a means to derive pecuniary gain and resolve private differences. And it extended certain First Amendment protections to the former but not to the latter. So the court has made this distinction between public interests versus private attorneys. I'm good, Judge. Anything else? All right, I gave counsel a little more time. Why don't you take one more minute to say whatever else you want to say. I will just close by saying that the integrity of the capital punishment process depends on transparency in both the courtroom and the public square. And the people in whose name executions take place are entitled to reliable, balanced information about what capital punishment entails. And the judiciary, who are the last line of defense in preventing an unconstitutional execution, are entitled to the benefit of expert opinion and meaningful adversarial testing to protect against unconstitutional executions. And conversations about the death penalty should be robust, uninhibited, and wide open. Thank you. All right, thank you very much. We appreciate the argument from both counsel. As you've gleaned from our earlier cases, we remain under COVID restrictions, so we can't come down and shake hands with counsel. So we hope we'll have that chance in the future. So before we go to our last case, we're going to take a very short recess, and then we'll be back for it.
judges: G. Steven Agee, Julius N. Richardson, A. Marvin Quattlebaum Jr.